UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

NAACP NEW YORK STATE CONFERENCE,
as an organization and representative of its members,
NATIONAL COALITION ON BLACK CIVIC
PARTICIPATION, as an organization and
representative of its members; FAMILIES UNITED
FOR RACIAL AND ECONOMIC EQUALITY, as an
organization and representative of its members;
WORKING FAMILIES PARTY, as a political party
and representative of its members; VIVIAN BOSIER,
ANITA BURSON and SHEILA DUNCAN,

                    Plaintiffs,

    - against -

NEW YORK STATE BOARD OF ELECTIONS;
JAMES A. WALSH, DOUGLAS A. KELLNER,
EVELYN J. AQUILA, and GREGORY P.
PETERSON, in their official capacities as
Commissioners of the New York State Board of
Elections; TODD D. VALENTINE and
ROBERT A. BREHM, in their official capacities
as Executive Directors of the New York State Board
of Elections; NEW YORK CITY BOARD OF
ELECTIONS; and JOSE MIGUEL ARAUJO, NAOMI
BARRERA, JULIE DENT, NANCY MOTTOLA-
SCHACHER, JUAN CARLOS POLANCO,
MICHAEL J. RYAN, J.P. SIPP, GREGORY C.
SOUMAS, JUDITH D. STUPP, and FREDERIC M.
UMANE, in their official capacities as Commissioners
of the New York City Board of Elections

                    Defendants.

-------------------------------------------------------------------X

Civil Action No.

**COMPLAINT**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ JUN 28 2010 ★
BROOKLYN OFFICE

CV 10 - 2950

BLOCK, J.

LEVY, M.J

       Plaintiffs, by their attorneys, Jenner & Block LLP and the Brennan Center for Justice at

New York University School of Law, as and for their complaint against Defendants New York

State Board of Elections (the "State Board"); James A. Walsh, Douglas A. Kellner, Evelyn J.

Aquila, and Gregory P. Peterson, in their official capacities as Commissioners of the New York

State Board of Elections (the "State Commissioners"); Todd D. Valentine and Robert A. Brehm,

in their official capacities as Executive Directors of the New York State Board of Elections; the

New York City Board of Elections (the "City Board"); and Jose Miguel Araujo, Naomi Barrera,

Julie Dent, Nancy Mottola-Schacher, Juan Carlos Polanco, Michael J. Ryan, J.P. Sipp, Gregory

C. Soumas, Judith D. Stupp, and Frederic M. Umane, in their official capacities as

Commissioners of the New York City Board of Elections (the "City Commissioners"),

respectfully complain as follows:

## NATURE OF ACTION

1.      Plaintiffs bring this action to prevent State and local election officials from

configuring newly purchased voting machines in such a way as to increase dramatically the

likelihood that voters will inadvertently cast overvotes, preventing their votes from being

counted.  In particular, Plaintiffs seek to prevent the disenfranchisement of racial and language

minorities, who are disproportionately likely to lose their votes as a result of Defendants' new

procedure for handling overvotes.

2.      As required by the federal Help America Vote Act ("HAVA"), passed after the

2000 presidential election debacle in Florida, New York State is changing its voting machines

and overhauling procedures for all federal, State, and local elections starting in September of this

year.  In accordance with HAVA's mandate, the State Board has approved the use of two optical-

scan electronic voting machines to replace the lever voting machines currently in use.  Most

counties have chosen a machine made by Dominion Voting Systems Corporation.  The City

Board and Albany, Erie, Nassau, Rockland and Schenectady counties have chosen a machine

made by Election Systems and Software Corporation ("ES&S").

2

3.     Other jurisdictions using the same or similar optical-scan machines employ certain protections for handling overvoted ballots cast by voters.  Instead of employing such protections, the State Board will use a different procedure that will unnecessarily disqualify the votes of tens of thousands of voters.  Moreover, data from other jurisdictions and from past elections in New York demonstrate that Defendants' procedure will have a disproportionate effect on African-American and Latino voters by ensuring that their votes -- far more than those of White and English-speaking voters -- will be lost at a higher rate.

4.     An overvote occurs when a person votes for more candidates than the maximum number allowed in a given electoral contest.  The lever machines used in New York elections to date incorporated a mechanical interlock system that prevented voters from casting overvoted ballots at all.  If a voter selected more than the permitted number of candidates for a given contest, the lever would lock, and the machine simply would not allow the voter to pull the lever and cast her ballot until she had reduced the number of votes in the contest to the permitted number.  Similarly, many jurisdictions outside of New York State set their optical-scan machines to return a ballot to the voter immediately when an overvote has been cast and to provide a clear message describing the problem and the consequence of casting an overvoted ballot.

5.     By contrast, Defendants have indicated that they will disable these protections on New York's optical-scan machines.  Instead of automatically returning an overvoted ballot to the voter, the new machines will display a confusing message that not only fails to explain the problem, but actually encourages the voter to press a button that will cast the flawed ballot.  Unless a voter understands the message well enough to request that the ballot be returned, the machine will not return the ballot so that it can be corrected.  Each of these problems can be readily addressed with minor adjustments to the settings of the voting machines, which

3

jurisdictions in other states have already used successfully in past elections to prevent unnecessary overvotes.

6.      Unfortunately, Defendants' failure to include these overvote protections will lead to an entirely predictable and devastating result for African-American, Latino, and other minority voters. It is estimated that, had Defendants' procedure been in place during the 2008 general elections, over 18,000 voters in New York City and tens of thousands of voters across New York State, would have had their ballots disqualified for the presidential contest alone because of preventable overvotes. Statistical evidence shows that these invalidated ballots will disproportionately be cast by African-American, Latino, and other minority voters.

7.      Studies of election results have consistently shown that without adequate protections against overvotes, minority voters are substantially more likely than White voters to have their votes discarded. *See, e.g.*, Stephen Knack & Martha Kropf, *Voided Ballots in the 1996 Presidential Election: A County-Level Analysis*, 65 J. POLITICS 3, 881 (2003) (finding a significantly higher incidence of voided ballots in counties with large African-American and Latino populations and finding that the difference in overvote rates between minority and White voters disappears in jurisdictions that use equipment that prohibits overvoting); D. E. "Betsy" Sinclair & R. Michael Alvarez, *Who Overvotes, Who Undervotes, Using Punchcards? Evidence from Los Angeles County*, 57 POLITICAL RESEARCH QUARTERLY 1, 15 (2004) (finding that race, gender, and non-English ballot preference are predictors of high overvote rates); MINORITY STAFF, SPECIAL INVESTIGATIONS DIVISION, COMMITTEE ON GOVERNMENT REFORM, U.S. HOUSE OF REPRESENTATIVES, INCOME AND RACIAL DISPARITIES IN THE UNDERCOUNT IN THE 2000 PRESIDENTIAL ELECTION (2001) (finding that the congressional districts with the highest rates of uncounted ballots were low-income, minority-dominant districts); Michael Tomz and Robert P.

4

Van Houweling, *How Does Voting Equipment Affect the Racial Gap in Voided Ballots?* 47 AM.
J. POLITICAL SCIENCE 1, 46 (2002). Defendants' procedure for handling overvotes will thus have
a significant discriminatory effect on the rights of African-American, Latino, and other minority
voters protected by the Voting Rights Act.

8.     This discriminatory impact is entirely avoidable. Indeed, the manufacturers of the
voting machines expressly provide election officials with an option for setting the machines to
return overvoted ballots automatically. If Defendants used the same overvote protections that are
made available by the manufacturers and used by other jurisdictions, they could comply with
HAVA's mandate without causing the ballots of minority voters to be disproportionately
invalidated.

9.     Notably, the State Board is fully aware that its refusal to provide overvote
protections will have a destructive impact. The State Board has publicly discussed its overvote
procedure and acknowledged the harms to voters that will be caused. Yet despite those
discussions, the State Board and the City Board have refused to change the overvote procedure to
protect voters by displaying a clear message or by automatically returning an overvoted ballot for
correction.

10.     Plaintiffs seek declaratory and injunctive relief from this District Court.
Specifically, Plaintiffs seek a declaration that Defendants' proposed procedure for handling
overvotes would, in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973(a), deny
Plaintiffs and their members the right to vote on account of race through the use of a practice or
procedure that has a disproportionate and negative impact on the franchise of African-American,
Latino, and other minority voters, and Plaintiffs seek a preliminary and permanent statewide

injunction prohibiting the Defendants from implementing the announced procedure in upcoming and future elections.[1]

## JURISDICTION AND VENUE

11.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), 2201, 2202, and 42 U.S.C. § 1983.

12.    Venue lies in this Court pursuant to 28 U.S.C. § 1391(b) because jurisdiction is not founded on diversity of citizenship and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district and the effect of Defendants' challenged overvote procedure will be felt in this judicial district.

## THE PARTIES

13.    Plaintiff the NAACP New York State Conference is a 72-year-old civil rights, non-profit, non-partisan organization with members throughout New York State. High among the organization's many civil rights priorities is its longstanding commitment to voting rights. The NAACP New York State Conference engages in voter mobilization and registration, and includes among its members politically active citizens of color throughout New York State, including the Bronx, Brooklyn and Manhattan, who are regular voters.

14.    Plaintiff the National Coalition on Black Civic Participation ("NCBCP") is a non-profit, non-partisan organization dedicated to increasing Black civic engagement and voter participation. NCBCP consists of 80 organizations that work to address the disenfranchisement of African Americans and other marginalized groups through voter participation. Thirty-five NCBCP member organizations are based or have chapters in New York State, and include

---

[1] On information and belief, Defendants intend to submit their overvote procedure to the Attorney General for preclearance in accordance with Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. In the event that Defendants do not file the requisite preclearance submission, Plaintiffs reserve the right to amend this Complaint to assert a claim pursuant to Section 5.

6

among their members individuals of color who live and vote in the Bronx, Brooklyn, and Manhattan, as well as other counties throughout New York State.

15.     Families United for Racial and Economic Equality ("FUREE") is a Brooklyn-based multi-racial, non-profit, non-partisan organization made up almost exclusively of women of color.  With approximately 1,200 members, many of whom live and vote in Brooklyn, the organization uses direct action, leadership development, community organizing, civic engagement, and political education to win changes for its members.  An integral part of this work is FUREE's "get out the vote" operation in the Fort Greene and Bedford-Stuyvesant sections of Brooklyn.

16.     Plaintiff Working Families Party is a political party under N.Y. ELEC. LAW § 1-104.3 with local chapters throughout New York State.  The goal of the Working Families Party is to inject the issues of lower-income, working people -- such as jobs, wages, health care, education, and housing -- into the public debate, and to elect candidates who support policies that improve the lives of working families in New York City and State.  The Working Families Party was launched in June of 1998, and first obtained official ballot status as a recognized political party by obtaining over 50,000 votes for its gubernatorial candidate that year.  Approximately one-half of its registered members in New York City are African-American and Latino voters.  The Working Families Party has members in all 62 counties in New York State.

17.     Plaintiff Vivian Bosier is an eligible and registered African-American voter and member of the Working Families Party.  Ms. Bosier is a resident of the Bronx, New York.  She has lived at the same address for 35 years.  Ms. Bosier has been a regular voter for decades.  She is concerned about the political strength of her community and fears that votes from her,

7

members of her party, or members of her community will be denied as a result of the challenged procedure.

18.     Plaintiff Anita Burson is an eligible and registered Black Native American voter and member of the Democratic Party. She has been registered and has regularly voted in Brooklyn, New York for nearly four decades. Ms. Burson has worked for many years to stop the disenfranchisement of voters belonging to disadvantaged communities. In the early 1970s, she coordinated the first on-site registration efforts in her high school, and, more recently, she served as the voter empowerment coordinator for the NAACP in Kings County, New York. Ms. Burson worries that the lack of overvote protections will damage the voting strength of her own community, as well as language minorities and other traditionally disenfranchised groups and those with low computer literacy.

19.     Plaintiff Sheila Duncan is an eligible and registered African-American voter currently residing in Manhattan. She is a registered member of the Working Families Party and votes regularly in elections. Ms. Duncan fears that her vote, and those of her party or her community, will be denied as a result of the challenged procedure.

20.     Defendant New York State Board of Elections has "jurisdiction of, and [is] responsible for, the execution and enforcement of . . . statutes governing campaigns, elections and related procedures." N.Y. ELEC. LAW § 3-104(1). According to the State Board's website, "in addition to the regulatory and enforcement responsibilities the board is charged with the preservation of citizen confidence in the democratic process and enhancement in voter participation in elections." http://www.elections.state.ny.us/AboutSBOE.html (last visited April 20, 2010). Pursuant to N.Y. ELEC. LAW §7-200(1), the State Board exercises control over the selection and configuring of voting machines to be used throughout the State.

21.     James A. Walsh, Douglas A. Kellner, Evelyn J. Aquila, and Gregory P. Peterson are Commissioners of the New York State Board of Elections.

22.     Todd. D. Valentine and Robert A. Brehm are Co-Executive Directors of the New York State Board of Elections.  They have been designated by the State as the "chief state election officials" within the meaning of federal law.

23.     Defendant New York City Board of Elections is constituted pursuant to N.Y. ELEC. LAW § 3-200.  According to its 2008 Annual Report, the City Board is responsible for "conduct[ing] fair and honest elections, from local to federal levels; . . . enfranchis[ing] all eligible New Yorkers to register to vote and to practice those rights; . . . conduct[ing] elections, certify[ing] the canvass and to retain the official records; . . . [and] voter outreach and education."  New York City Board of Elections, 2008 Annual Report, available at: http://www.vote.nyc.ny.us/pdf/documents/boe/AnnualReports/BOEAnnualReport08.pdf.  The City Board is responsible for administering elections in New York City, including the challenged procedure at issue in this case.

24.     Jose Miguel Araujo, Naomi Barrera, Julie Dent, Nancy Mottola-Schacher, Juan Carlos Polanco, Michael J. Ryan, J.P. Sipp, Gregory C. Soumas, Judith D. Stupp, and Frederic M. Umane are Commissioners of the New York City Board of Elections.

25.     As a courtesy, Plaintiffs are providing a copy of this Complaint to the New York State Attorney General and to the Office of Corporation Counsel for the City of New York.

## FACTUAL ALLEGATIONS

### New York State's Replacement of its Voting Systems Pursuant to HAVA

26.     In response to the debacle of the 2000 presidential election in Florida, epitomized by "hanging chads," Congress passed HAVA, 42 U.S.C. § 15301, *et seq.* in 2002.  Among other

things, HAVA required that states replace their existing voting systems to comply with certain

"minimum election administration standards for States and units of local government." *Id.*

27.    The State Board failed to comply with HAVA and was sued by the Department of

Justice ("DOJ") in March 2006 for failing to replace the State's voting machines. That lawsuit

ended with the State Board reaching an agreement with the DOJ to replace all lever voting

systems in the State with HAVA-compliant voting systems by September 2007. Litigation over

the State Board's compliance is ongoing. *See United States v. N.Y. State Bd. of Elections*, No. 06

CV 263 (N.D.N.Y.). That litigation does not relate to the overvote procedure challenged here,

and nothing in Plaintiffs' requested relief would in any way delay or impede the implementation

of the new voting machines across the State.

28.    In 2009, the State Board certified two optical-scan voting machines from which

the county boards of elections and the City Board were required to choose to replace their

existing lever voting machines: the Dominion ImageCast and the ES&S DS200.

29.    Unfortunately, as further discussed below, Defendants refuse to use the built-in

protections against overvotes that are made available by the machines' manufacturers and used

by many jurisdictions outside of New York. As a result, tens of thousands of votes will be

needlessly lost in this fall's elections and in future elections. Those votes will disproportionately

be cast by African-American, Latino, and other minority voters.

### Defendants' New Procedure for Handling Overvotes

30.    For almost 50 years, New York has used lever-operated voting machines. To vote

on such a machine, a voter flips a switch next to each candidate's name or issue for which she

wishes to vote in each contest, and then pulls a large lever from right to left, casting her vote and

re-setting the machine for the next voter. The lever-operated machines incorporate a mechanical

10

interlock system that prevents voters from casting overvoted ballots. If a voter attempts to select more than the permitted number of candidates for a given contest, the lever locks and the voter cannot flip the switch next to the extra candidate's name until she reduces the number of votes in the contest to a permitted number. Because of this interlock system, New York State's rate of election day in-precinct overvotes on these lever-operated machines was zero.

31.     Optical-scan machines are routinely set to provide similar protections against casting overvotes. Many other jurisdictions have set their optical-scan voting machines to return an overvoted ballot to the voter automatically with a clear explanation of the nature of an overvote and the fact that the voter's vote will not be counted unless it is corrected.

32.     By contrast, Defendants refuse to set New York's voting machines to provide similar overvote protections. Upon information and belief, Defendants have set the Dominion ImageCast and ES&S DS200 voting machines so that the machines will not automatically return an overvoted ballot to the voter for correction and instead will provide a series of confusing messages to the voter that encourage the voter to cast the ballot without correcting the overvote.

33.     Under the procedure adopted by Defendants, when a voter casts a ballot containing an overvote, the machine will begin to beep and display an overvote message.

34.     For the ES&S DS200 machine, the bottom of the screen will display a graphic of a red button that the voter presses to return the ballot and a green button to cast the vote. The red button graphic contains an "X" and the message, "Don't Cast -- Return Ballot." The green button graphic contains a check mark and the message, "Accept." A "screen shot" of the proposed "Over Voted Ballot" message is attached to this Complaint as Exhibit A.

35.     For the Dominion ImageCast machine, a physical green button labeled "Cast" and a red button labeled "Return" are built into the machine below the electronic screen.

36.    By pressing the green button, the voter can stop the machine's beeping, cast her

ballot, and allow the people in line after her to vote.  However, by pressing the green button the

voter also ensures that her selections with respect to the contest(s) in which she overvoted will

not be counted.  Only if the voter presses the red button will the ballot be returned to her for

correction.

37.    For both machines, the overvote message does not explain what an overvote

means.  Nor does the message explain to the voter that the consequence of choosing the green

button and "accept[ing]" an overvoted ballot is that her vote in the contest will remain

uncorrected and will not be counted.  Instead, the machine sends the confusing and counter-

intuitive message that if the voter presses the green button, the voter's votes will be "accepted."

38.    Not surprisingly, usability experts who have reviewed Defendants' procedures

believe that the message and graphics of the overvote screen, together with the fact that the

machines retain the ballot with errors instead of immediately rejecting it, will actually encourage

the casting of overvoted ballots, rather than offer a protection against such mistakes.

39.    Defendants have conceded that the overvote message is confusing and that many

voters will not understand what the message means.  Specifically, at a State Board meeting on

February 18, 2010, Commissioners Aquilah and Peterson both stated that they believed most

voters would not understand the message.  Commissioner Peterson noted that the message was

particularly problematic in light of the fact that the lever-operated machines, which voters have

used in the past, made overvotes impossible.

40.    Other jurisdictions using the same voting machines have properly embraced a

very different procedure to protect against overvotes.  For example, counties in Florida that use

the ES&S DS200 have set their machines to explain to voters, in the event of an overvote, that

12

"You have made too many votes in [N] contest(s)!  See a poll worker for help."  Furthermore,

instead of merely providing voters with red and green buttons labeled "Don't Cast

-- Return Ballot" and "Accept," the Florida counties' message explains the consequence of each

choice to the voter.  One choice is labeled "Correct Your Ballot" and explains:  "Press the button

below to return your ballot.  See a poll worker for a replacement ballot."  The second choice is

labeled "Cast Your Ballot with Errors," and further cautions the voter with the message:

"Warning!  If you press the button below your ballot will be cast and the contest(s) with too

many votes will not be counted!"  A "screen shot" of the Florida counties' overvote message is

attached to this Complaint as Exhibit B.

41.     Similarly, the State of Wisconsin conditioned its purchase of the ES&S DS200

machines on a guarantee from the manufacturing company that the machines would be set to

return a ballot to the voter immediately if it detects an overvote.

42.     In two conference calls in which the State Board and various voting-rights

advocates discussed the procedure at issue, the State Board acknowledged the negative effects of

its procedure but declined to make the necessary adjustments because members of the State

Board speculated that returning overvoted ballots to voters would slow the voting process on

election day.  A representative from the State Board also expressed the view that, because other

unforeseen errors will surely arise on election day when the Dominion ImageCast and ES&S

DS200 machines are used for the first time in New York, it would be easier for the State Board

to address the overvote procedure together with those other problems after the election takes

place.  Even if the concerns of the State Board were credible -- which they are not, based upon

the contrary experience in other jurisdictions -- these stated concerns would not justify or

13

outweigh the adverse and discriminatory impact their overvote procedure will have on African-American, Latino, and other minority voters, in violation of the Voting Rights Act.

### Evidence that Defendants' Procedure Will Result in More Overvotes

43.     Of the nearly 1,500 counties in the United States that use optical-scan machines at their polling places, upon information and belief only 13 counties, all located in Florida, have used Defendants' procedure for handling overvotes in a major election.  A comparison of the overvote rates in these 13 counties with the overvote rates in neighboring counties demonstrates that the 13 Florida counties that have used Defendants' overvote procedure experienced overvote rates far greater than those in neighboring counties.

44.     Counties in Florida that immediately rejected overvoted ballots and automatically returned them to voters for the presidential contest had overvote rates close to zero for all voters, regardless of race, on election day.  Together, the 31 Florida counties that used the Premier OS and OSx systems, which were set to return overvoted ballots automatically, had an election day overvote rate of 0.04% for the presidential contests for all voters in 2008.  Similarly, the five counties that used the ES&S Optechs, which were also set to return overvoted ballots automatically, had an election day overvote rate of 0.03% in the presidential contest for all voters.  In total, there were just 651 votes discarded in the presidential contest on election day in these 36 counties due to overvoting.

45.     By contrast, in the 13 counties that used Defendants' overvote procedure, the election day overvote rate for the presidential contest was 0.54% -- a rate that was more than 13 times greater than the overvote rate in Florida counties that automatically returned the overvoted ballots.  In total, there were 8,791 votes in the presidential contest discarded due to overvoting on election day in these 13 counties.

46.   The data further show that these differences in overvote rates were caused by the overvote protections used -- or not used -- by the Florida counties.  This can be seen by comparing the overvote rates for voters who cast absentee ballots with the overvote rates for voters who cast their ballots on election day by using the voting machines.

47.   Voters who vote by absentee ballot do not interact with the voting machines and therefore do not receive any notification when they have cast an overvote and do not have any opportunity to correct any overvote.  In the 13 Florida counties that used Defendants' overvote procedure, voters who cast their ballot in person on election day -- and thus saw the same confusing message New Yorkers will see if the challenged procedure remains in place -- overvoted at virtually the same rate as voters who cast absentee ballots from home without the benefit of any voting machine to warn them when they had inadvertently cast an overvoted ballot.

48.   By contrast, counties that set their voting machines to return the overvoted ballot automatically experienced dramatically different overvote rates between absentee voters and those who voted on the machines.  Voters in these neighboring counties who cast their ballots by absentee (and therefore did not receive any of the overvote protections afforded by the voting machines) cast overvotes at a similar rate as absentee voters in the 13 Florida counties that used Defendants' overvote procedure.  But when voters cast their ballot in person on election day (and were therefore notified by the voting machine when they cast an overvoted ballot and automatically received their ballots to be corrected) the overvote rate dropped to nearly zero.  This statistical evidence indicates that with a better overvote-protection policy, Florida counties were able to decrease dramatically the number of overvotes cast in their polling places.

15

## Evidence that Overvotes Disproportionately Affect
## African-American, Latino, and other Minority Voters

49.     The evidence from Florida also confirms that African-American, Latino, and other minority voters were disproportionately and negatively affected by the lack of overvote protection.

50.     Four of the 13 counties in Florida that used New York's challenged procedure for handling overvotes made enough data publicly available to perform a statistical analysis. Three common approaches for determining the impact of election laws and procedures on minority voters (homogenous precinct, ecological regression, and ecological inference analyses) show that African-American and Latino voters in these counties were significantly more likely to cast overvoted ballots on election day than were White voters in the same jurisdictions.

51.     While these three approaches provide differing estimates of the overvote rates in the four Florida counties, they consistently show higher estimates of overvote rates among African-American and Latino voters. In Miami County, the estimated overvote rate ranged from 0.6% or lower among White voters, from 0.8% to 0.9% among Latino voters, and from 1.6% to 3.3% among African-American voters. In Orange County, the estimated overvote rate ranged from 0.1% to 0.4% among White voters, from 0.8% to 1.2% among Latino voters, and from 1.1% to 2.1% among African-American voters. In Collier County, the estimated overvote rate ranged from 0.5% to 0.7% among White voters, from 1.1% to 2.5% among Latino voters, and from 2.4% to 3.6% among African-American voters. In Pinellas County, where less than three percent of registered voters are Latino and there was not a single majority Latino precinct, there was insufficient information to allow for reliable estimates of the Latino overvote rate, but all three analyses showed an overvote rate of 0.4% among White voters and a rate that ranged from 1.1% to 1.6% among African-American voters.

16

52.     On average in the four counties, the overvote rate for African-American voters was approximately five times that for White voters, and the overvote rate for Latino voters was almost three times that for White voters.

53.     By contrast, there were no such statistically significant racial disparities in the Florida counties that immediately returned the overvoted ballot to the voter and provided a clear notification of the consequences of casting an overvoted ballot. In those counties, overvote rates were close to zero on election day for all voters regardless of race.

54.     The overvote data for St. Lucie County -- which used machines that immediately returned overvoted ballots -- demonstrate that better overvote protection policies eliminate the racial disparity in overvoting. The overvote rates for St. Lucie County's absentee ballots (which had no overvote protections since they were cast by mail rather than by machine) predictably showed dramatic differences among racial groups. The overvote rate was 2.48% for majority African American precincts, but just 0.06% for majority White precincts. By contrast, there was no similar racial disparity in overvote rates for in-person precinct voting on election day. In fact, there was only one overvote during in-precinct election day voting in the majority African-American precincts, resulting in an overvote rate of 0.017%, while the overvote rate for majority White precincts was (a still very low) 0.046%.

55.     Similarly, the election day overvote rate for the presidential contest in Duval and Leon Counties, which both contain large cities with significant minority populations and also immediately returned overvoted ballots, demonstrates how a better overvote protection policy can be effective in reducing overvote rates for African-American and Latino voters. In both counties, over 25% of voters in 2008 were either African-American or Latino, and in both

counties there were zero reported overvotes for President on election day voting, for all voters in all precincts, regardless of race.

### The Racially Disparate Impact on Voters in New York

56.    There is reason to believe that overvote rates would be even higher in New York than they were in the 13 Florida counties that employed Defendants' overvote procedure. Because New York previously used lever-operated machines that made it impossible to cast an overvote, most New York voters -- in contrast with Florida voters -- are unfamiliar with the danger of overvoting.

57.    Previously, the only overvotes occurring in New York have been those cast on paper ballots used for absentee and affidavit voting.  Using the overvote rates observed on paper ballots in the 2008 New York elections, it is estimated that, had Defendants' proposed procedure been in place at that time, lacking adequate overvote protections, tens of thousands of voters across New York State -- and 18,000 voters in New York City alone -- would have had their votes disqualified because of overvotes.

58.    Assuming a similar distribution of overvotes among African-American, Latino, and White voters in New York City as in Collier, Miami-Dade, Orange and Pinellas Counties, Florida, and using the U.S. Census data for New York City from 2000, it is estimated that approximately half of the lost votes in New York City would be from African American voters, close to 30% from Latino voters, and less than 20% from White and other voters.

59.    As noted above, the data from Florida show that those racial disparities can be eliminated by setting the voting machines to return overvoted ballots automatically to the voter for correction, and providing a clear notification of the consequences of casting an overvoted ballot.  Florida counties that employed these safeguards reduced the overvote rate nearly to zero

for voters who cast their ballots on election day, regardless of race, eliminating the racial disparity that existed in counties that failed to provide overvote protections.

### Requiring Overvote Protections Is Mechanically Feasible and Consistent with HAVA and State Law

60. Defendants could easily set their voting machines to provide overvote protections used in other jurisdictions, thereby eliminating racial disparity in overvoting and bringing their election day overvote rates to zero, or close to it.

61. Albany, Erie, Nassau, Rockland and Schenectady Counties and the City Board use the ES&S DS200 machine. As represented by ES&S in their "Requirements Response" to the City Board, "[i]n the setup of the DS200 the [Board of Elections] will have the ability to . . . force a voter to view their overvote error before being able to cast the ballot." The same ES&S document states that the Board "is responsible for determining the correct procedures for handling . . . overvoted ballots. *These ballots can be predetermined to be returned to the voter . . . .*" (emphasis added).

62. Upon information and belief, both the State Board and ES&S have indicated that setting the machines to return overvoted ballots to the voter automatically would not require any modification of the system's source code -- and would therefore not require any recertification or cause any delay in preparations for the upcoming elections.

63. Moreover, this Court can require Defendants to implement overvote protections without creating any conflict with HAVA or the ongoing litigation in *United States v. N.Y. State Bd. of Elections*, No. 06 CV 263 (N.D.N.Y.). Plaintiffs do not seek to prevent Defendants from using the voting machines required by HAVA and there is nothing in the relief requested that would do so; Plaintiffs ask only that Defendants set those machines properly to provide critical overvote protections.

64.     Indeed, in asking Defendants to set New York's voting machines to include overvote protections, Plaintiffs are merely asking Defendants to provide protections that are already required by New York State law.  New York law specifies that, when a voter submits an overvoted ballot, the voting machine must "notify the voter that the voter has selected more than one candidate for a single office on the ballot, notify the voter before the ballot is cast and counted of the effect of casting multiple votes for the office, and provide the voter with the opportunity to correct the ballot before the ballot is cast and counted." N.Y. ELEC. LAW § 7-202(1)(d).

65.     In addition, 9 N.Y.C.R.R. § 6210.5(a) requires that voting machines be used in compliance with the United States Election Assistance Commission's 2005 Voluntary Voting System Guidelines, which specify, in turn, that "in response to a ballot with an overvote the system shall . . . return the ballot" to the voter for correction.  2005 VVSG 4.1.5.1(iii).

66.     In sum, the relief requested by Plaintiffs is not merely consistent with New York State laws; it is required by those laws.

### The Irreparable Harm to Plaintiffs and African-American and Latino Voters

67.     Courts have routinely presumed irreparable harm for violations of Section 2 of the Voting Rights Act, which impair the rights of individual voters and the public at large.  Here, Plaintiffs have alleged that Defendants' decision not to employ adequate overvote protections on the Dominion ImageCast and ES&S DS200 voting machines will have a discriminatory impact on African-American, Latino, and other minority voters, including members of the NAACP, NCBCP, FUREE and the Working Families Party.  Defendants' overvote procedure will effectively deny those voters the equal opportunity to cast a valid ballot that is counted on account of their race or color.

68.     This unnecessary burden on the NAACP, NCBCP, and FUREE and their members will be particularly severe because the vast majority of the members of all three organizations are people of color.  Members of these organizations will suffer harm in the near and definite future by casting overvoted ballots as a result of Defendants' confusing overvote procedure.  As large organizations representing thousands of African-American and Latino voters, there is an extremely high likelihood that one or more members of the plaintiff organizations will have his or her vote invalidated as a result of Defendants' overvote procedure in upcoming and future elections.  NAACP, NCBCP, and FUREE are entitled to sue on behalf of their members to prevent this irreparable harm from occurring.

69.     Moreover, in addition to the irreparable harm suffered by their members, NAACP, NCBCP, and FUREE will suffer their own independent injuries from the personnel, time, and resources they will have to divert in order to educate their members about Defendants' confusing new overvote procedures in order to minimize the number of ballots that are invalidated as a result of accidental overvotes.  This diversion of resources from the organizations' regular activities constitutes an independent injury suffered directly by the organizations.

70.     The impact on Working Families Party will also be severe because approximately one half of that party's New York City membership consists of African Americans and Latinos.  In addition, over 20% of its state membership consists of African Americans and over 14% consists of Latinos.  Because members of those protected groups will suffer disproportionately from the impact of Defendants' overvote procedure, the Working Families Party and its members will be robbed not only of their individual votes on election day but also of their chosen political party's strength at the polls.

71.      If Defendants implement and continue to use their new overvote procedure,

Plaintiffs will suffer irreparable harm in connection with the primary elections in September

2010 and the general elections in November 2010, and they will continue to suffer irreparable

harm in every subsequent election in which that overvote procedure is used.

### FIRST CAUSE OF ACTION

### (Violation of Section 2 of the Voting Rights Act)

72.      Plaintiffs repeat and reallege every allegation in paragraphs 1-71 as if set forth

herein in length.

73.      Section 2 of the Voting Rights Act, 42 U.S.C. § 1973(a), provides: "No voting

qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or

applied by any State or political subdivision in a manner which results in a denial or abridgement

of the right of any citizen of the United States to vote on account of race or color. . . ."

74.      Defendants' practice and procedure for handling overvotes will disproportionately

harm minority voters -- and African-American and Latino voters in particular -- by causing them

to cast invalid overvotes at higher rates than White voters.  Defendants' practice and procedure

for handling overvotes will thus have a disparate impact on minority voters, and especially

African-American and Latino voters, resulting in the denial or abridgment of their right to vote

on account of race or color.

75.      Plaintiffs and their members will be irreparably harmed if they are forced in the

upcoming elections to use voting machines that are administered in accordance with Defendants'

overvote practice and procedure, and they cannot be adequately compensated for this harm in an

action at law for money damages.

22

76.     Unless this Court issues declaratory relief and preliminary and permanent injunctive relief, Defendants will implement and continue to use the aforementioned practice and procedure in violation of federal law.

\*     \*     \*

WHEREFORE, the Plaintiffs respectfully demand judgment against Defendants on the foregoing causes of action as follows:

A.      Awarding a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that the Defendants' overvote practice and procedure results or will result in the denial of New York citizens' right to vote on account of race or color, in violation of Section 2 of the Voting Rights Act;

B.      Entering a preliminary and permanent state-wide injunction pursuant to Federal Rule of Civil Procedure 65 restraining and enjoining Defendants individually and in their official capacities from enforcing or applying the practice and procedure regarding overvotes;

C.      Awarding the Plaintiffs the costs and fees, including attorneys' fees, they have incurred to bring this action under 42 U.S.C. § 1973(e) and 42 U.S.C. § 1988; and

D.      Such other and further relief as the Court may deem just and proper given the facts and circumstances herein.

Dated:  New York, New York
        June 28, 2010

By:_____

Wendy Weiser                      Jeremy M. Creelan
Lawrence Norden                   Joshua A. Block\*\*
Myrna Pérez\*                      Eric P. Brown\*\*
Brennan Center for Justice        Prashant Yerramalli\*\*

23

at New York University School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013
(212) 998-6730

*Admission in New York pending
** Not admitted in Eastern District
   of New York

JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, New York 10022
(212) 891-1600

*Attorneys for Plaintiffs*

# Exhibit A



# Exhibit B

You have made too many votes in N contest(s)!
See a poll worker for help.

**Correct Your Ballot**

Press the button below to return
your ballot. See a poll worker
for a replacement ballot.

Correct Your
Ballot

**Cast Your Ballot with Errors**

Cast Your Ballot
with Errors

02 19 2007 0:10:03 3:00

Success to be Final